O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MICHELLE SUZANNE HADLEY, | Case No. 8:18-cv-01831-DOC-KES |
|     Plaintiff, | |
| | |
|     v. | ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [129] [131] [133] |
| CITY OF ANAHEIM ET AL., | |
|     Defendants. | |

Before the Court are three Motions for Summary Judgment (the "Anaheim MSJ," "Angela Diaz MSJ," and "Ian Diaz MSJ," and collectively the "Motions") (Dkts. 129, 131, and 133, respectively), brought by Defendants City of Anaheim, James Pewsey, William Segletes, Michael Lee, Michael Cunha, Angela Marie Diaz, and Ian Richard Diaz (collectively the "Defendants"). Having reviewed the briefing submitted by the parties, the Court now GRANTS IN PART the Anaheim MSJ, DENIES the Angela Diaz MSJ, and DENIES the Ian Diaz MSJ.

## I.    Background

### A.    Facts

The Court has repeatedly set out the factual allegations in this action and hereby incorporates such accounts by reference. Notwithstanding significant disputes of fact between the parties—discussed in greater detail below—the following summary should suffice for the present purposes:

In October 2013, Plaintiff Michelle Suzanne Hadley ("Plaintiff") met and began dating Defendant Ian Diaz, who was employed as a U.S. Marshal. Their relationship deteriorated as Defendant Ian Diaz became controlling and abusive, including persistently badgering Plaintiff to indulge his sexual fantasies and begging her to have sex with strangers. On February 14, 2014, while Plaintiff was sick and taking cold medication, she finally gave in to Defendant Ian Diaz's demands, at which point he arranged for a stranger from Craigslist to come over, gave Plaintiff three shots of whiskey, and set up cameras in their bedroom. Defendant Ian Diaz filmed and watched from another room as the stranger had sex with Plaintiff. Plaintiff was traumatized by the incident and later confided to Defendant Ian Diaz that she felt like the encounter was a rape, which characterization angered Defendant Ian Diaz.

On or about June 5, 2015, Plaintiff and Defendant Ian Diaz purchased a condo in Anaheim (the "Property") as joint tenants. Plaintiff paid the down payment, and the two took out a mortgage for the remaining amount of $459,745. After they moved into the Property together, Defendant Ian Diaz became even more abusive and controlling. Plaintiff eventually left Defendant Ian Diaz in August 2015. She was subsequently diagnosed with PTSD and suffered a trauma-induced episode.

Defendant Ian Diaz continued to reside at the Property, which became a point of contention between him and Plaintiff. On November 24, 2015, the two entered into an agreement by which Defendant Ian Diaz would pay Plaintiff $3,000 in exchange for a quitclaim deed and Defendant Ian Diaz's assumption of the mortgage by June 5, 2016. By May 22, 2016, Defendant Ian Diaz had failed to take any steps to assume the mortgage as required by the agreement, so Plaintiff sent Defendant Ian Diaz an email stating her intent to enforce the agreement. On June 3, 2016, Plaintiff learned that Defendant Ian Diaz's application to assume the mortgage had been denied.

Plaintiff soon began receiving suspicious and strange electronic communications. On May 24, 2016, Plaintiff received LinkedIn messages and emails urging Plaintiff to warn Defendant Angela Diaz about her new husband, Defendant Ian Diaz. Plaintiff did not recognize the senders of these emails. Plaintiff also received notifications from Google about two spoofed email address purportedly belonging to her. Plaintiff also received an invitation to the Property from "iandiaz@outlook.com," an email purporting to be Defendant Ian Diaz's. Plaintiff became fearful that Defendant Ian Diaz was plotting something against her, so she quit her job, dropped out of business school, and moved in with her parents in Ontario, California.

On June 1, 2016, Plaintiff received an email from "angiconnell@icloud.com," an address belonging to Defendant Angela Diaz, warning Plaintiff about the temporary restraining order ("TRO") that had been filed against her. Various emails impersonating Plaintiff were copied. On June 6, 2016, police officers arrived at Plaintiff's Ontario home and served a TRO ordering Plaintiff to stay away from Defendant Angela Diaz. Plaintiff later received a call from a detective asking about the emails, which Plaintiff explained were not hers, and Plaintiff expressed concerns that she was being framed. From June 7 through June 21, 2016, Plaintiff continued to express her concerns to the Anaheim Police Department ("APD"), the Ontario Police Department, the Department of Justice, the FBI, and Microsoft's abuse reports team. And after receiving a posting email about a "gang rape fantasy" advertisement on Craigslist, Plaintiff immediately contacted the Craigslist abuse report team.

Plaintiff did not meet or contact Defendant Angela Diaz until June 17, 2016, the date of the first TRO hearing. This was the first and only time they met, as well as the first time Plaintiff saw the harassing emails that were sent to Defendant Angela Diaz from fake email accounts falsely attributed to Plaintiff. On June 24, 2016, at 11:45 p.m., Plaintiff was arrested at her Ontario home after Defendant Angela Diaz had been allegedly attacked by a stranger who had shown up to have sex with her. The responding APD officers confiscated Plaintiff's phone, iPad, and laptop after Plaintiff attempted to show them the emails from the Defendants Ian and Angela Diaz and explain her case. Plaintiff was bailed out of jail the next morning, but her devices remained in police custody.

APD officers returned to arrest Plaintiff for attempted rape on July 14, 2016 and Plaintiff was subsequently incarcerated in the Orange County Central Women's Jail. Because Plaintiff was accused of sex crimes, she was assigned to the high-security unit, where she remained for two and a half months. Plaintiff suffered numerous indignities of incarceration, including harassment, cavity searches, and mistreatment and abuses from guards and other inmates. In October 2016, the deputy prosecutor on Plaintiff's case released Plaintiff and asked her to participate in a sting, during which she spent three days in a hotel room under police supervision. Plaintiff does not appear to know why this was necessary or what the sting operation entailed. Afterwards, Plaintiff was released with an ankle monitor. On January 6, 2017, Angela Diaz was charged with several crimes, and on January 9, 2017, Plaintiff was exonerated from all the criminal charges against her.

Plaintiff later learned details of Defendants' conduct that contributed to or led to her arrest. Starting on September 4, 2015, Defendant Ian Diaz filed the first police report against Plaintiff to the APD. On September 10, 2015, he returned to the APD with an email exchange about the Property to try to get a TRO against Plaintiff. In or about January 2016, Defendant Ian Diaz started a relationship with Defendant Angela Diaz. On May 24, 2016, Plaintiff began receiving spoof emails from accounts that were allegedly created by Defendant Ian Diaz. On May 25, 2016, the same account began emailing Defendant Angela Diaz to warn her about Defendant Ian Diaz. Defendant Angela Diaz also began to receive threatening and graphic

emails and messages from an account allegedly created by Defendant Ian Diaz to pose as Plaintiff. The emails were signed with Plaintiff's name but were often sent using a VPN to protect the sender's anonymity.

On June 1, 2016, Defendant Angela Diaz went to the Superior Court of California with the emails to try and get a TRO against Plaintiff. Around 9:00 p.m. that same night, Defendants Ian and Angela Diaz filed a police report with the APD against Plaintiff. Over the following days, Defendant Angela Diaz reported violations of the TRO and called the police because she was continuing to receive more threatening emails, signed with Plaintiff's name, from accounts purportedly belonging to Plaintiff. On June 6, 2016, Defendant Ian Diaz influenced the Ontario Police Department to have the TRO served on Plaintiff and have Plaintiff arrested for violating the TRO.

Starting on June 13, 2016, Defendant Ian Diaz began using spoof emails—pretending to be Plaintiff pretending to be Defendant Angela Diaz—to post and respond to rape fantasy advertisements on Craigslist and directing strangers to Defendant Angela Diaz at the Property. On June 13, 2016, Defendant Angela Diaz called the police to report a stranger at the Property who was allegedly there to rape her. Defendants Ian and Angela Diaz showed the responding detective emails allegedly sent by Plaintiff and insisted that Plaintiff was behind the emails and needed to be arrested.

After serving warrants on Craigslist and Microsoft to investigate the advertisements and emails, APD officers discovered on June 18, 2016 that the rape fantasy Craigslist advertisement was linked to an email belonging to Defendant Ian Diaz. Defendant Angela Diaz reported additional Craigslist advertisements on June 19 and 20, 2016. On June 21, 2016, Microsoft responded to the warrant, revealing that two emails purportedly belonging to Plaintiff were in fact sent from the IP address corresponding to the Property—where Defendants Ian and Angela Diaz, not Plaintiff, resided.

On June 24, 2016, Defendant Angela Diaz reported an attack by a stranger from Craigslist and Plaintiff was arrested, despite the fact that security footage at the Property did not show any activity against Defendant Angela Diaz. Defendant Cunha, from the APD, later

testified that he believed Defendant Angela Diaz faked the entire attack, including inflicting injuries on herself. While Plaintiff's devices were still in police custody and when she did not have access to other communication devices, Defendant Angela Diaz received another threatening email and another Craigslist advertisement was posted. On June 26, 2016, APD detectives ran tests on Plaintiff's phone and were unable to find evidence linking her to the emails or the Craigslist advertisements. However, Defendants Ian and Angela Diaz continued to report and forward offending emails for the next two weeks, representing that they were coming from Plaintiff. Plaintiff was arrested again on July 14, 2016.

Throughout this series of events, the investigating Defendant Officers allegedly neglected voluminous exculpatory evidence. Plaintiff believes that had due attention been paid to such evidence, she never would have been arrested, and the true culprits, allegedly Defendants Ian and Angela Diaz, would have been exposed early on in their attempts to frame Plaintiff. Plaintiff also asserts that Defendant City of Anaheim bears responsibility for this deficient investigation, as proper policies and training procedures would have prepared the Defendant Officers to competently investigate the circumstances of this case, particularly the digital evidence involved.

On September 30, 2016, Defendant Ian Diaz met with detectives and reported that he believed Defendant Angela Diaz had framed Plaintiff. Defendant Ian Diaz was not investigated. Defendant Angela Diaz was arrested on January 6, 2017 and pleaded guilty on October 17, 2017. Plaintiff was exonerated on January 9, 2017, having spent 88 days in jail after being framed. Plaintiff continues to suffer paranoia and anxiety as a result of this experience, starting with her abusive relationship with Defendant Ian Diaz and continuing through the attempts to frame her, her arrests, and her incarceration.

### B.    Procedural History

After a series of dismissals and amendments, Plaintiff filed her Fifth Amended Complaint (Dkt. 106) on November 7, 2019. Defendants Angela and Ian Diaz filed motions to dismiss (Dkts. 108, 112), which the Court granted in part (as to Defendant Angela Diaz) and denied (as to Defendant Ian Diaz) on January 28, 2020 ("Dismissal Order") (Dkt. 120). Defendant Angela

Diaz also moved to dismiss punitive damages from the Fifth AC on February 5, 2020 (Dkt. 121), which the Court denied on March 9, 2020 (Dkt. 135).

Plaintiff's remaining claims for summary judgment are as follows:

(1) 42 U.S.C. § 1983 civil rights violation (excessive force), against Defendants Pewsey, Segletes, Lee, and Cunha;

(2) 42 U.S.C. § 1983 civil rights violation (unreasonable seizure of person), against Defendants Pewsey, Segletes, Lee, and Cunha;

(3) 42 U.S.C. § 1983 civil rights violation (unreasonable seizure of property), against Defendants Pewsey, Segletes, Lee, and Cunha;

(4) 42 U.S.C. § 1983 *Monell* liability (unconstitutional custom, practice, policy), against Defendant City of Anaheim;

(5) 42 U.S.C. § 1983 *Monell* liability (failure to train), against Defendant City of Anaheim;

(6) California Civil Code § 52.1 (Bane Civil Rights Act), against Defendants City of Anaheim, Pewsey, Segletes, Lee, and Cunha;

(7) false imprisonment and false arrest, against Defendants City of Anaheim, Pewsey, Segletes, Lee, and Cunha;[1]

(8) battery, against Defendants Pewsey, Segletes, Lee, and Cunha;

(9) assault, against Defendants Pewsey, Segletes, Lee, and Cunha;

(10) negligence, against Defendants Pewsey, Segletes, Lee, and Cunha;

(11) malicious prosecution, against Defendant Ian Diaz;[2] and

(12) intentional infliction of emotional distress, against Defendant Ian Diaz and Angela Diaz.

See generally Fifth AC.

Defendants filed the instant Motions for Summary Judgment on March 9, 2020. On April 28, 2020, Plaintiff filed her opposition briefs ("Anaheim Opposition," "Angela Diaz

---

[1] The Court dismissed this claim against Defendant Angela Diaz. Dismissal Order at 4.
[2] The Court dismissed this claim against Defendant Angela Diaz. Dismissal Order at 6.

Opposition," and "Ian Diaz Opposition") (Dkts. 147, 149, and 150, respectively), and Defendants submitted their replies ("Anaheim Reply," "Angela Diaz Reply," and "Ian Diaz Reply") (Dkts. 155, 156-1, and 157, respectively) on May 18 and 19, 2020.

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere

existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III. Discussion

Defendants challenge each of Plaintiff's remaining claims in the Fifth AC. As further discussed below, except for the claims Plaintiff concedes, summary judgment is improper because Plaintiff's claims all present genuine questions of material fact.

### A. Plaintiff Concedes That Summary Adjudication Is Appropriate Against Her First, Eighth, and Ninth Causes of Action

Plaintiff concedes that "there is no genuine dispute of fact as to whether the quantum of force used in handcuffing and detaining [Plaintiff] was 'reasonable,' and therefore that her First Cause of Action (Excessive Force under § 1983) and her Eighth Cause of Action (Battery) may be adjudicated at summary judgment." Anaheim Opp'n at 3 n.2. The Anaheim Opposition also does not address Plaintiff's claim for assault. *See generally id.* The Court therefore finds it appropriate to treat this claim as conceded as well. *See, e.g.*, *Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."). Summary judgment is proper against these causes of action and is accordingly granted.

### B. Plaintiff's Second, Third, Sixth, Seventh, and Tenth Causes of Action Raise Genuine Questions of Material Fact

Defendants City of Anaheim, Pewsey, Segletes, Lee, and Cunha (collectively the "Anaheim Defendants") argue that Plaintiff's claims for unreasonable seizure, Bane Act violations, false imprisonment and false arrest, and negligence are barred because the Defendant Officers (i.e., Defendants Pewsey, Segletes, Lee, and Cunha) had probable cause to arrest Plaintiff and acted reasonably. They further argue that qualified immunity precludes Plaintiff's claims under § 1983 and that the *Smiddy* presumption immunizes the Defendant Officers from liability. Plaintiff disagrees.

### 1.    Genuine Disputes of Material Fact Exist Regarding Probable Cause

*Legal standard.* Probable cause requires some "probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Put differently, there must be "a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted). The Supreme Court has routinely refused to precisely define or quantify the probable cause standard, explaining that probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 370-71 (quoting *Gates*, 462 U.S. at 232).

Probable cause is analyzed in the totality of the circumstances "from the standpoint of an objectively reasonable police officer." *Wesby*, 138 S. Ct. at 586 (quoting *Pringle*, 540 U.S. at 371). "As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (omissions in original) (citations omitted).

*Discussion.* The Anaheim Defendants argue that the undisputed facts show that probable cause existed, *see* Anaheim MSJ at 10-16, and that any disputed facts are immaterial to the probable cause analysis, *see* Anaheim Reply at 11-16. Plaintiff contends that the Anaheim Defendants ignored a substantial amount of exculpatory evidence, undermining probable cause. *See* Anaheim Opp'n at 7-17.

The Anaheim Defendants list the following evidence to demonstrate that probable cause existed: (1) Defendant Cunha's inability to verify "e-mail addresses and other information" found on Plaintiff's phone; (2) men purportedly showing up at Angela Diaz's house in response to Craigslist rape fantasy advertisements; (3) similar language between earlier emails from Plaintiff and the later fabricated emails; and (4) the Orange County District Attorney's decision to file charges against Plaintiff. Anaheim MSJ at 10-11. Additionally, Defendants Angela and Ian Diaz gave the Defendant Officers "a relatively detailed account of what happened" and

copies of the emails. *Id.* at 13. According to the Anaheim Defendants, this shows that probable cause existed in the totality of the circumstances. The Anaheim Defendants also cite *Peng v. Hu*, 335 F.3d 970 (9th Cir. 2003), for the proposition that an officer has sufficient knowledge for probable cause if "the victim provides 'facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.'" 335 F.3d at 978 (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)).

This argument is unavailing. First, on its own terms, it ignores the coexisting duty under Ninth Circuit case law to "independently investigate the basis of the witness' knowledge." *Peng*, 335 F.3d at 978 (citing *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001)). This duty is especially crucial where, as here, the "victim" or "witness" is attempting to frame the accused "perpetrator." Indeed, if the Court viewed the Anaheim Defendants' legal authority in isolation—to the exclusion of the countervailing duty of independent investigation—probable cause would *always* obtain when a "victim" gave information to the police to frame a "perpetrator." It should come as little surprise, then, that the law does not mandate such an illogical and inhumane result.

Second, according to Plaintiff, a staggering quantity of evidence—allegedly disregarded by the Defendant Officers—calls probable cause into question. Plaintiff offers the following exculpatory evidence to suggest that her first arrest on June 24, 2016 was not supported by probable cause:

(1) On June 18, 2016, Defendant Cunha received warrant returns linking a June 11, 2016 rape fantasy advertisement to Defendant Ian Diaz's email account. Defendant Ian Diaz subsequently confirmed the email address was his and admitted that he had corresponded with the poster of the advertisement. Anaheim Opp'n at 8.

(2) On June 21, 2016, Defendant Cunha received warrant returns for the "lilithistruth@outlook.com" email address, from which the offending emails were sent. The warrant returns showed that nine of the abusive emails were sent from an IP address already known to Defendant Cunha as Defendant Ian Diaz. *Id.* at 8-9.

(3) Defendant Cunha knew that Plaintiff had filed a complaint about Defendant Ian Diaz's abusive behavior with the Department of Justice. He also knew that Plaintiff had contacted Defendant Lee earlier in June 2016 to report that she believed Defendant Ian and/or Angela Diaz was fabricating evidence to make it appear that Plaintiff was violating the TRO. *Id.* at 9.

(4) In his interview with Plaintiff on June 24, 2016, Defendant Cunha learned that Plaintiff had filed reports about Ian Diaz with Chapman University and Disneyland (her former school and workplace), and that she had reported fraudulent use of her email address to Microsoft and Craigslist. *Id.* at 9.

(5) While reviewing Plaintiff's phone on June 24, 2016, Defendant Cunha saw that Plaintiff had received an email from Craigslist requesting verification of a fraudulent advertisement posted using her email address; he also saw the Plaintiff had not verified the advertisement. *Id.* at 9. (Notwithstanding the lack of verification, Defendant Cunha testified that this contributed to his belief that he had probable cause for Plaintiff's arrest. *Id.* at 10.)

(6) During the same review of Plaintiff's phone, Defendant Cunha observed that Plaintiff did not have an email account on her phone for either "lilithistruth@outlook.com" or "ianrdiaz@outlook.com." *Id.* at 10.

Plaintiff argues that similar exculpatory evidence demonstrates that her second arrest, on July 14, 2016, was also without probable cause:

(1) While the threatening emails stopped after Plaintiff was arrested on June 24, 2016, she was bailed out on June 25, 2016 at 10:15 a.m. Defendant Angela Diaz reported that the threatening emails resumed at 11:28 a.m. on June 25, 2016—less than an hour and fifteen minutes after Plaintiff was bailed out of jail. Plaintiff contends that Defendant Cunha knew that, during that window, Plaintiff's devices were still in the possession of the Anaheim Police Department. *Id.* at 11.

(2) On June 26, 2016, Defendant Cunha sent "control emails" to the "lilithistruth@outlook.com" email address, from which the 11:28 a.m. email was sent. The

"lilithistruth@outlook.com" email account responded, but Defendant Cunha observed that Plaintiff's "phone did not appear to be receiving any of the control emails." *Id.* at 11.

(3) On June 26, 2016, Defendant Cunha found emails from Plaintiff to abuse@outlook.com to report several email addresses—including "lilithistruth@outlook.com"—that she believed were fraudulently associated with her Gmail account for the purpose to sending threatening emails. *Id.* at 12.

Taken together, Plaintiff's proffered evidence casts serious doubt on whether the Anaheim Defendants had probable cause for her arrest. Were this information available to a reasonably competent investigator, its exculpatory force would clearly tend to dissipate probable cause. While the Court will not decide at this juncture that the Anaheim Defendants did not have probable cause—nor does Plaintiff argue for cross-summary judgment on this issue, *see* Anaheim Opp'n at 12—the Court does find that there exist genuine questions of material fact regarding probable cause. Summary judgment on this basis is accordingly denied.

### 2.     The Defendant Officers Are Not Entitled to Qualified Immunity

*Legal standard.* Qualified immunity, in actions brought pursuant to 42 U.S.C. § 1983, "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine attempts to strike a balance between the twin interests in holding irresponsible public officials accountable and protecting reasonable officials "from harassment, distraction, and liability." *Id.* Qualified immunity applies whether the official was mistaken about a fact, the law, or a mixed question thereof. *Id.* Critically, qualified immunity "is 'an immunity from suit rather than a mere defense to liability,'" and is therefore "effectively lost if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The Supreme Court has established a two-step process for deciding claims of qualified immunity. First, the court must decide whether the facts alleged or shown (depending on the stage of the litigation) demonstrate a violation of a constitutional right. *Id.* at 232. The facts must

be viewed "in the light most favorable to the party asserting injury." *Green v. City & County of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). If so, the court must then determine whether the right was "clearly established" at the time of the alleged violation. *Pearson*, 555 U.S. at 232. If no right was violated, or the right was not clearly established at the time, then qualified immunity protects the defendant official from suit. Conversely, if a "genuine issue of material facts exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018).

*Discussion.* The Anaheim Defendants argue that the Defendant Officers are entitled to qualified immunity because no published cases involve fraudulent rape fantasy advertisements, and thus any of Plaintiff's rights, if violated, could not have been clearly established. Anaheim MSJ at 16-18. Plaintiff responds that the Anaheim Defendants take too narrow a view of whether Plaintiff's rights were clearly established at the time. *See* Anaheim Opp'n at 19.

For the first step of the qualified immunity test, neither party appears to contest that Plaintiff alleges violations of her constitutional rights. The Court also finds that, on this record, there at least exists a genuine issue of material fact as to whether Plaintiff was subjected to unreasonable searches and seizures in violation of her Fourth Amendment rights.

As for the second step, the Court agrees with Plaintiff that the strange facts of this case do not cabin the relevant case law to the (apparently empty) set of published decisions involving fake rape fantasy solicitations on Craigslist. Far more salient here is an officer's obligation— which is established, beyond any doubt, in our case law—to conduct an adequate independent investigation and to consider exculpatory evidence. *See, e.g.*, *Peng*, 335 F.3d at 978 (quoting *Arpin*, 261 F.3d at 925) ("[The Ninth Circuit] has said that 'officers may not solely rely on the claims of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses.'"); *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (citing *Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir. 1999)) ("An officer is not entitled to a qualified immunity defense, however, where exculpatory evidence is ignored that would negate a finding of probable cause.").

The Court finds, therefore, that there is a clearly established right to be free of searches and seizures unsupported by probable cause, and there are genuine disputes of material fact as to whether the Anaheim Defendants had probable cause for Plaintiff's arrests. In addition to the disputes of fact listed above regarding probable cause, Plaintiff raises several other factual assertions against a finding of qualified immunity:

(1) Defendant Cunha "relied exclusively on unverified information," viz., printouts or forwards of emails and Craigslist advertisements, and statements from Defendant Angela Diaz. Anaheim Opp'n at 20. Defendant Cunha, moreover, ignored his inability to verify information from Defendant Angela Diaz. *Id.* at 20-21.

(2) Though Defendant Cunha knew the emails he had reviewed were sent from a VPN, he found no VPN applications on Plaintiff's phone, and Plaintiff told him that Defendant Ian Diaz used VPNs. Defendant Cunha ignored this apparent incongruity. *Id.* at 21.

(3) The condominium complex where Defendant Angela Diaz was purportedly assaulted "had multiple security cameras throughout the complex that would have captured the movements of [the] alleged assailant," but the Defendant Officers only checked the footage from one camera. *Id.* at 22.

(4) While Defendant Cunha's review of Plaintiff's devices did not uncover any evidence linking Plaintiff to the Craigslist advertisements or threatening emails, Defendant Cunha "continued to focus exclusively on [Plaintiff] as a suspect." *Id.*

(5) The Defendant Officers "did nothing to verify whether [Plaintiff] was responsible for sending a new, harassing email to [Defendant Angela] Diaz less than one hour from her release from jail," and such investigation would have revealed that Plaintiff "did not have access to any communication devices" when the offending email was sent. *Id.*

Taken together, then, these disputes of fact (including those discussed with respect to probable cause above) raise a genuine question about probable cause, and especially whether the Defendant Officers conducted an adequate independent investigation as required by binding case law. It follows that there are genuine disputes of material fact as to whether Defendants violated Plaintiff's clearly established Fourth Amendment rights. In such circumstances, the

Ninth Circuit has held that summary judgment is improper, *Bonivert*, 883 F.3d at 872, and the
Court accordingly denies the Anaheim MSJ on this basis.

> **3.**    **Genuine Disputes of Material Fact Preclude Summary Judgment on**
> **the *Smiddy* Presumption**

*Legal standard.* In constitutional tort cases, typically, "the '[f]iling of a criminal
complaint immunizes investigating officers . . . because it is presumed that the prosecutor filing
the complaint exercised independent judgment in determining that probable cause for an
accused's arrest exists at that time.'" *Caldwell v. City & County of San Francisco*, 889 F.3d
1105, 1115 (9th Cir. 2018) (alteration in original) (quoting *Smiddy v. Varney*, 665 F.2d 261, 266
9th Cir. 1981, *overruled on other grounds by Beck v. City of Upland*, 527 F.3d 853 (9th Cir.
2008)). A plaintiff can rebut this presumption in various ways, such as by showing that the
prosecutor was pressured by police, that the prosecutor was given false information, that the
police acted maliciously or with reckless disregard for the plaintiff's rights, that the prosecutor
relied on the police investigation instead of making an independent judgment, or that wrongful
or bad-faith conduct on the part of the officers was instrumental in bringing about the
prosecution. *See Beck*, 527 F.3d at 862-63 (emphasizing that the listed examples are not
exhaustive).

*Discussion.* The Anaheim Defendants argue that Senior Deputy District Attorney Rick
Zimmer made a neutral, independent decision to file felony charges against Plaintiff, insulating
the Defendant Officers from liability stemming from Plaintiff's second arrest. Anaheim MSJ at
18-22. Plaintiff contests the independence of Mr. Zimmer's judgment and argues that he was
improperly influenced by the Defendant Officers. Anaheim Opp'n at 23-30.

The parties do not contest that the Orange County District Attorney's office was not
involved in Plaintiff's first arrest, on June 24, 2016. As such, *Smiddy* offers no protection to the
Defendant Officers with respect to her first arrest. As for her second arrest, on July 14, 2016, the
Court finds that Plaintiff has raised a substantial question of material fact as to whether Mr.
Zimmer exercised the sort of independent judgment needed to trigger the *Smiddy* presumption
and protect the Defendant Officers from liability.

To support her position, Plaintiff presents evidence in support of the following claims:

(1) Mr. Zimmer's assigned investigator was "rotated off" of Plaintiff's case before conducting any investigation. Mr. Zimmer relied only on the APD's investigation to approve the June 24, 2020 search warrant of Plaintiff's devices. Anaheim Opp'n at 24.

(2) At the time he approved the search warrant, Mr. Zimmer was unaware that Plaintiff had contacted Microsoft to report improper use of her email account or that Plaintiff had warned the APD that she believed Defendant Ian Diaz was fabricating the offending emails. *Id.* at 25.

(3) The Orange County District Attorney's office did not undertake an independent investigation of the allegations against Plaintiff until months after her second arrest. This investigation, which was much more thorough than the APD's and accounted for exculpatory evidence, revealed Plaintiff's innocence—suggesting that the initial decision to charge Plaintiff was based solely on the APD's investigation rather than any independent judgment. *See id.*

(4) Mr. Zimmer testified that his complaint against Plaintiff was not based on any independent investigation of the purported evidence against Plaintiff and relied exclusively on the APD investigation. *Id.* at 25, 30.

(5) Mr. Daniel Becerra, the investigator from the Orange County District Attorney's office assigned to the case in September 2016, immediately noticed significant "holes" in the APD's investigation against Plaintiff. Mr. Becerra's subsequent investigation sought to "plug" those "holes," and in so doing he identified several severe weaknesses in the APD's investigation. This evidence all tended to exonerate Plaintiff. *See id.* at 26-28.

(6) Mr. Zimmer described himself as "embedded in the police department," and admitted that he "was in constant contact with Detective Cunha," who would inform Mr. Zimmer of "things he wanted to do on the case." *Id.* at 29.

The Court finds that Plaintiff has, at minimum, raised enough evidence to call into question the prosecutor's independent judgment and rebut the *Smiddy* presumption. Summary judgment is therefore unwarranted on this basis.

### 4.    Summary Judgment Is Inappropriate Against Plaintiff's Bane Act Claim

*Legal standard.* The Tom Bane Civil Rights Act, codified as California Civil Code section 52.1, provides a civil cause of action to protect individual rights guaranteed under state or federal law, when the interference with said rights is accomplished with "threats, intimidation, or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). To succeed on a Bane Act claim, a plaintiff must demonstrate (1) that the defendant violated the plaintiff's rights; (2) that the violation was accompanied by threat, intimidation, or coercion, or had any of those as an inherent aspect of the violation; and (3) that the defendant had the specific intent to violate the plaintiff's rights. *See id.* at 1043. The Ninth Circuit has also found support for these requirements in California's model jury instructions, which include as an element of a Bane Act claim that the defendant "*intentionally interfered with* . . . [his/her] civil rights." *Id.* at 1044 (quoting CACI 3066, "Bane Act—Essential Factual Elements (Civ. Code, § 52.1)").

*Discussion.* The Anaheim Defendants argue that Plaintiff's Bane Act claim must fail because they "did not make an unlawful arrest or use[] excessive force" against Plaintiff. Anaheim MSJ at 24. As noted above, Plaintiff has conceded her claim of excessive force, but she argues that her allegedly unconstitutional arrest and imprisonment suffice to sustain her Bane Act claim. Anaheim Opp'n at 37. In particular, Plaintiff argues that a reasonable jury could infer the Defendant Officer's specific intent to violate Plaintiff's rights because, allegedly, they "willfully and repeatedly ignor[ed] the voluminous amounts of evidence exculpating [Plaintiff] and implicating the Diazes." *Id.* at 38.

Viewing the present record in the light most favorable to Plaintiff, as required on summary judgment, the Court is persuaded by Plaintiff's argument. The Anaheim MSJ offers no evidence to suggest that the Defendant Officers did not act with the specific intent to violate Plaintiff's rights. *See* Anaheim MSJ at 23-24. Plaintiff, meanwhile, has presented enough evidence—enumerated above—to raise a genuine dispute of material fact as to whether the Defendant Officers intentionally ignored evidence that supported Plaintiff's innocence. Because

the Anaheim Defendants have not met their burden to demonstrate the absence of a genuine issue of material fact for trial, and because Plaintiff has set forth evidence to raise such an issue, the Court denies summary judgment on the Bane Act claim.

### C.   Plaintiff's Fourth and Fifth Causes of Action Raise Genuine Questions of Material Fact

Plaintiff's Fifth AC alleges that Defendant City of Anaheim is liable under § 1983 for maintaining an unconstitutional custom, practice, or policy, and for failing to properly train its law enforcement officers. *See* Fifth AC ¶¶ 228-241. Defendants argue that summary judgment should be entered against these causes of action because the Anaheim Defendants did not deprive Plaintiff of a constitutional right and because Plaintiff has not presented enough evidence on these claims to survive summary judgment. Anaheim MSJ at 24-25.

#### 1.   Legal Standard

To hold a municipality liable under § 1983 for the violation of a constitutional right, a plaintiff must establish liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "[M]unicipalities may be held liable as 'persons' under § 1983 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Monell*, 436 U.S. at 694). The Ninth Circuit has recognized three additional ways to demonstrate municipal liability: if "(1) the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity'"; or "(2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy"; or "(3) an official with final policy-making authority 'delegated that authority to, or ratified the decision of, a subordinate.'" *Id.* (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)).

Four conditions must be satisfied to establish municipal liability under *Monell*. The plaintiff must show "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate

indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (alteration in original) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).

When a *Monell* claim is predicated on a municipality's failure to train, a plaintiff must show that (1) they were deprived of a constitutional right; (2) the municipality's training policy "amounts to deliberate indifference to the rights of persons" with whom its employees are likely to come into contact; and (3) the constitutional injury would have been avoided had the municipality properly trained those employees. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001)).

## 2.    Discussion

As previously mentioned, the Anaheim Defendants argue for summary judgment against *Monell* liability on two grounds: first, because Plaintiff's constitutional rights were not violated, and second, because Plaintiff has not produced evidence of a policy amounting to deliberate indifference. *See* Anaheim MSJ at 25. Neither argument succeeds.

First, as discussed at length above, Plaintiff has, at minimum, raised genuine issues of material fact concerning probable cause and the constitutionality of her arrests. Defendant City of Anaheim thus cannot avoid *Monell* liability with the assertion that Plaintiff suffered no constitutional violation.

Second, the Anaheim Defendants cite *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997), for the proposition that "deliberate indifference is a stringent standard of fault." *See* Anaheim MSJ at 25 (citing, *inter alia*, 520 U.S. at 410). But the Supreme Court was reviewing a jury verdict in that case, *see* 520 U.S. at 402, not an order on summary judgment. To survive summary judgment, Plaintiff need only raise a genuine issues of material fact regarding Defendant City of Anaheim's policies and training. It remains to be seen whether Plaintiff, at trial, can meet the "stringent standard" these claims face, but the Court will not prematurely impose that burden now.

Plaintiff has, moreover, produced evidence to present a genuine issue of material fact. Her expert witness, for example, represents that "APD Policy 814," governing the collection,

preservation, and validation of digital evidence, falls short of current best practices. Anaheim Opp'n at 33-34. Plaintiff further argues that the deficiency of Policy 814 and the concomitant lack of training led to Defendant Cunha's mishandling of her electronic devices throughout his investigation. *Id.* at 34. Plaintiff also cites testimony from Defendant City of Anaheim's witnesses to illustrate the City's lack of training and policy in support of competent digital investigation. *Id.* at 35-36. Finally, Plaintiff cites evidence to the effect that Defendant Cunha's training was informal, inadequate, and out of date, and that, as a result, he was out of his depth in conducting the investigation. *Id.* at 36.

Collectively, Plaintiff's evidence raises a genuine question of material fact as to whether Defendant City of Anaheim's policies and officer training regarding digital investigations were so deficient as to constitute deliberate indifference to a suspect's Fourth Amendment rights. While the Anaheim Defendants observe that Plaintiff will face a "stringent standard" to prove these claims at trial, she will at least be given the opportunity to try, as summary judgment is inappropriate on these claims.

### D.   Plaintiff's Eleventh Cause of Action Raises Genuine Questions of Material Fact

Defendant Ian Diaz argues that he cannot be liable for malicious prosecution because the evidence shows that he was not "actively instrumental" in Plaintiff's prosecution. Ian Diaz MSJ at 12-19. Plaintiff responds that the evidence does not support Defendant's position. Ian Diaz Opp'n at 7-14.

#### 1.   Legal Standard

To plead a malicious prosecution claim in California, a plaintiff must allege that the prosecution or proceeding in question—commenced by or at the direction of the defendant in question—was: (1) pursued to a legal termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice. *Villa v. Cole*, 4 Cal. App. 4th 1327, 1335 (1992); *see also Sagonowsky v. More*, 64 Cal. App. 4th 122, 128 (1998). If a plaintiff cannot establish any of these three elements, their claim for malicious prosecution will fail. *StaffPro, Inc. v. Elite Show Servs., Inc.*, 136 Cal. App. 4th 1392, 1398 (2006).

A private person "may be held liable for malicious prosecution under certain circumstances based on his or her role in the criminal proceeding." *Zucchet v. Galardi*, 229 Cal. App. 4th 1466, 1481 (2014). To determine whether a private person may incur liability, "[t]he test is whether the defendant was actively instrumental in causing the prosecution." *Id.* (quoting *Sullivan v. County of Los Angeles*, 12 Cal. 3d 710, 720 (1974)). It is not enough that the private person appears as a witness or provides information to authorities during a criminal investigation; instead, the individual must "take some affirmative action to encourage the prosecution by way of advice or pressure, as opposed to merely providing information." *Id.* at 1485 (citation omitted). That is, the defendant must have "insisted upon or urged further prosecution of the case," given advice, or "place pressure on the government" for liability to attach. *Id.* Even testifying falsely is within the scope of "providing information" and does not in itself support liability for malicious prosecution. *See id.*

### 2.   Discussion

*Scope of the malicious prosecution claim.* Defendant Ian Diaz first undertakes an exegesis of the Court's Dismissal Order (Dkt. 120) to argue that Plaintiff's malicious prosecution claim can only be predicated on his direct statements to the APD as captured on body camera footage. *See* Ian Diaz MSJ at 13-15. Curiously, the Ian Diaz MSJ directly quotes—but neglects to consider—the Court's clear indication ("for example"; "e.g.") that the Court was providing examples of the sufficiency of Plaintiff's Fifth AC. *See id.* at 13-14 (quoting Dismissal Order at 5-6). The Court denied the motion to dismiss on a sufficient, not exhaustive, basis, and in no way limited the scope of Plaintiff's malicious prosecution claim moving forward.

*Summary judgment is inappropriate.* An extended analysis of this claim is unnecessary. Defendant Ian Diaz presents evidence to support his claim that he was not actively instrumental in causing Plaintiff's prosecution and that he did not advise or pressure any APD officers. Ian Diaz MSJ at 15-19. Plaintiff, for her part, cites credible evidence to the contrary, and argues that testimony by Mr. Zimmer and Defendant Cunha cited by Defendant Ian Diaz should be given

1    less weight (as both would be incentivized to downplay or deny Defendant Ian Diaz's alleged

2    influence over them). Ian Diaz Opp'n at 9-14.

3         Given these disputes, there obviously exist genuine issues of fact to be resolved at trial.

4    The Court therefore denies summary judgment on this cause of action.

5    **E.    Plaintiff's Twelfth Cause of Action Raises Genuine Questions of Material**

6         **Fact**

7         Against Plaintiff's claim for intentional infliction of emotional distress ("IIED"),

8    Defendant Ian Diaz argues that there is no evidence to link him to the creation of false evidence

9    against Plaintiff, and that any allegedly "extreme or outrageous" conduct is either time-barred,

10   waived, or privileged. *Id.* at 20-31. Defendant Angela Diaz similarly argues that Plaintiff has

11   failed to prove the elements of an IIED claim and that her false police reports were privileged

12   under California law. *See* Angela Diaz MSJ at 4-7.

13        **1.    Legal Standard**

14   ***Elements of an IIED claim.*** According to the California Supreme Court:

15        The elements of the tort of intentional infliction of emotional distress are

16        "(1) extreme and outrageous conduct by the defendant with the intention of

17        causing, or reckless disregard of the probability of causing, emotional

18        distress; (2) the plaintiff's suffering severe or extreme emotional distress;

19        and (3) actual and proximate causation of the emotional distress by the

20        defendant's outrageous conduct."

21   *Christensen v. Superior Court*, 54 cal. 3d 868, 903 (1991) (quoting *Davidson v. City of*

22   *Westminster*, 32 Cal. 3d 197, 209 (1982)). In order to qualify as "outrageous," the conduct in

23   question "must be so extreme as to exceed all bounds of that usually tolerated in a civilized

24   society." *Trerice v. Blue Cross of Cal.*, 209 Cal. App. 3d 878, 883 (1989) (quoting *Fowler v.*

25   *Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 44 (1987)). Outrageousness is usually, but not

26   always, a question left to the trier of fact. *Id.*

27        ***Section 47(b) privilege.*** Section 47(b) of the California Civil Code provides an absolute

28   privilege that "bars a civil action for damages for communications made '[i]n any (1) legislative

proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [statutes governing writ of mandate].'" *Hagberg v. Cal. Fed. Bank*, 32 Cal. 4th 250, 360 (2004) (quoting Cal. Civ. Code § 47(b)). Section 47(b) is intended to assure communication between private citizens and public authorities, as "the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings." *Hagberg*, 32 Cal. 4th at 360-61 (citations omitted).

Accordingly, this privilege has been interpreted as an absolute defense from tort liability following allegedly false reports "made to the police by a civilian that are intended to trigger an investigation into possible criminal activity." *See Ibekwe v. White*, No. CV 14-06523 DMG (JPRx), 2015 WL 12765113, at *7-8 (C.D. Cal. Sept. 9, 2015) (citing *Hagberg*, 32 Cal. 4th at 370); *see also Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008) (holding that a claim against a defendant for calling the police "is privileged under state law and thus cannot be the basis for tort liability"). The absolute privilege of section 47(b) extends to "immunize defendants from tort liability based on . . . intentional infliction of emotional distress." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1242 (2007). As interpreted by the California Supreme Court, "if the gravamen of the action is communicative," then the protection of section 47(b) "extends to noncommunicative acts that are necessarily related to the communicative conduct." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1065 (2006).

### 2.    Discussion

***Plaintiff's IIED claim against Defendant Ian Diaz.*** Plaintiff's IIED claim against Defendant Ian Diaz is based both on Defendant Ian Diaz's creation of false evidence and his abusive behavior during their relationship.

With respect to the attempt to frame Plaintiff, Defendant Ian Diaz argues that there is no evidence that he participated in the fabrication of evidence against Plaintiff. Plaintiff responds that such evidence exists—including Defendant Ian Diaz's own admission that he had responded

to a Craigslist rape fantasy advertisement, which responses he gave to the APD as evidence against Plaintiff. *See* Ian Diaz Opp'n at 16-17. Plaintiff goes on to list other evidence linking Defendant Ian Diaz to the creation of false evidence. *Id.* at 17-18. As such, the Court finds that a genuine issue of material fact exists regarding Defendant Ian Diaz's participation in the fabrication of evidence.

As for Defendant Ian Diaz's alleged abuse of Plaintiff during their relationship, Defendant Ian Diaz argues that Plaintiff's IIED claim is barred by the statute of limitations, equitable tolling does not apply, and that the claim was waived in a settlement agreement. The Court previously addressed the statute of limitations and equitable tolling in the Dismissal Order, and now finds that no evidence presented in the current briefing disturbs the Court's earlier conclusion: that Plaintiff is entitled to equitable tolling regarding the alleged abusive behavior. The Court further finds that Plaintiff's conduct in bringing the IIED claim against Defendant Ian Diaz was reasonable and in good faith. And, having considered the agreement signed by Plaintiff and Defendant Ian Diaz in 2016, which contains provisions disclaiming litigation and releasing claims, the Court finds that the agreement is properly understood, as a whole, as applying to property-related claims between the parties and does not contemplate waiver of claims related, e.g., to sexual violence or the resulting distress.

Therefore, Plaintiff may proceed with her IIED claim against Defendant Ian Diaz on the basis of both his alleged creation of false evidence and his alleged abusive behavior during their relationship.

***Plaintiff's IIED claim against Defendant Angela Diaz.*** Plaintiff's IIED claim against Defendant Angela Diaz is based only on the creation of false evidence in an effort to frame Plaintiff. Contrary to Defendant Angela Diaz's anemic argument, Plaintiff has presented more than enough evidence against Defendant Angela Diaz to survive summary judgment. For example, Plaintiff cites Defendant Cunha's testimony—describing in detail Defendant Angela Diaz's elaborate fabrication of her purported attempted rape, which she blamed on Plaintiff—as evidence of "extreme and outrageous conduct." *See* Angela Diaz Opp'n at 7. Furthermore, in its Order Denying Defendant Angela Diaz's Motion to Dismiss Punitive Damages ("Damages

Order") (Dkt. 135), the Court characterized Defendant Angela Diaz's alleged behavior as "undoubtedly despicable—the sort of conduct which no decent citizen should have to tolerate." Damages Order at 5. Plaintiff argues, and Defendant Angela Diaz does not dispute, that Plaintiff suffered severe and extreme emotional distress. And Plaintiff argues that causation obtains, as Defendant Angela Diaz's fabrication of evidence led directly to Plaintiff's property being seized, her arrests, and her incarceration. Angela Diaz Opp'n at 10-11. Plaintiff's evidence in support of each element of her IIED claim renders summary judgment improper.

Additionally, as the Court has previously held, Defendant Angela Diaz's alleged fabrication of evidence is not within the scope of the section 47(b) privilege. Dismissal Order at 8 (finding gravamen of conduct noncommunicative and thus beyond the reach of section 47(b)). Defendant Angela Diaz's attempt to relitigate this question is unavailing.

Plaintiff may therefore proceed with her IIED claim against Defendants Ian and Angela Diaz, and summary judgment on this cause of action is denied.

## IV. Disposition

For the reasons set forth above, the Court: (1) GRANTS IN PART the Anaheim Defendants' Motion for Summary Judgment (Dkt. 129); summary judgment is GRANTED against Plaintiff's claims for excessive force, assault, and battery, but is otherwise DENIED; (2) DENIES Defendant Angela Diaz's Motion for Summary Judgment (Dkt. 131); and (3) DENIES Defendant Ian Diaz's Motion for Summary Judgment (Dkt. 133).

DATED:  September 18, 2020

_David O. Carter_

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE